**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

KIESHA FOSTER,                                              *

     **Plaintiff,**                                      *

**v.**                                                                 **Case No.: GJH-16-4122**

                                                                *

GENEDX, INC.,                                             *

    **Defendant.**                                    *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

<u>**MEMORANDUM OPINION**</u>

Plaintiff Kiesha Foster alleges that Defendant GeneDx discriminated against her on the basis of her race and gender by compensating her less than her white male colleague and failing to promote her in violation of the Maryland Fair Employment Practices Act ("FEPA"), State Gov't Code, § 20-601 *et. seq*., the Montgomery County Code, § 27-19(a)(1), and 42 U.S.C. § 1981. Pending before the Court are Defendant's Motion to Strike, ECF No. 52, and Defendant's Motion for Summary Judgment, ECF No. 42. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the following reasons, Defendant's Motion to Strike will be denied, and Defendant's Motion for Summary Judgment will be granted in part and denied in part.

## I.    BACKGROUND[1]

Defendant specializes in genetic testing for rare hereditary disorders. ECF No. 41-2 ¶ 3. Defendant's Accessions Department conducts intake for patient specimens. *Id.* ¶ 6. Accessioners are responsible for receiving packages from clients, opening and sorting them, entering information into Defendant's computer database, delivering paperwork to document

---

[1] These facts are either undisputed or viewed in the light most favorable to the Plaintiff as the non-moving party.

management for scanning, and delivering samples for tissue culture and extraction for processing. *Id.*

Plaintiff is an African-American female who began working for Defendant as an Accessioner on August 6, 2007 after graduating from college with a Bachelor of Science degree. ECF No. 62-1; ECF No.48-2 at 26.[2] Her starting salary was $28,080. ECF No. 62-1. For some time, Plaintiff Foster worked under the supervision of Dr. Sherri Bale, the then President and Clinical Director. ECF No. 48-2 at 32–33.

Having a scientific background is helpful to accomplishing an Accessioner's duties. ECF No. 48-1 ¶ 5. In certain cases, Accessioners need to understand and interpret clinical indicators to ensure that the requested testing is reasonable, which requires a basic understanding of biology and genetics. *Id.* The Accessions Department tends to hire candidates with four-year college degrees, and because of its "competitive selection process," by 2014 all Accessioners "had at least a college degree and the majority had a Bachelor of Science instead of a Bachelor of Arts degree" during the time relevant to Plaintiff's case. *Id.* ¶ 4. Although a scientific background is helpful to the Accessioner role, there are no legal requirements that Accessioners possess a college degree because the Accessions Department qualifies as a non-technical lab. ECF No. 41-2 ¶ 13; ECF No. 41-27 at 8:12–9:14.

At the same time that Plaintiff joined the Accessions Department, Defendant hired Raymond Jubela as a receptionist earning $28,000 per year. ECF No. 42-1. Mr. Jubela is a white male. *Id.* Mr. Jubela did not have a four-year college degree but attended courses at Montgomery College from 1988 through 1991. ECF No. 41-5 at 3. When Defendant hired him, he had started to take classes at Montgomery College again and was working towards an Associate of Arts

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

degree. *Id.* Mr. Jubela had not taken any college-level science courses. ECF No. 48-6 at 42:17–43:3. He also did not have prior work experience in any scientific field. ECF No. 41-5.

Defendant included the following language in letters setting forth the terms of Plaintiff and Mr. Jubela's employment:

> You will be provided an annual review between December 1 of the current calendar year and January 31 of the next following calendar year and considered for a salary increase based on that review. Any such salary increase will take effect the first payroll period after February 1st of the next following calendar year and includes only February payroll duties.

ECF No. 48-2 at 17; ECF No. 48-3 at 54. Consistent with this policy, in December 2007, Defendant approved Mr. Jubela for a salary increase to $32,000, but that salary did not become effective until February 2008.[3] ECF No. 55 at 2. Defendant also increased Plaintiff's salary to $32,000 effective February 2008. ECF No. 48-2.

On September 2, 2008, Defendant promoted Mr. Jubela to Accessioner, the same position then held by Plaintiff. ECF No. 41-3 at 8:2–6. Although Mr. Jubela had received a stellar performance evaluation in February 2008, ECF No. 41-7, Plaintiff understood that Defendant transferred Mr. Jubela to the Accession department because it would limit his contact with clients since he lacked professionalism answering the phone. ECF No. 41-3 at 8:8–12. Although Mr. Jubela did not have a four-year college degree or a scientific background, Mr. Jubela's starting salary as an Accessioner was about $4,000 higher in 2008 than Plaintiff's starting salary as an Accessioner had been in 2007. As of September 2, 2008, however, they were both earning $34,000. ECF No. 62-3; ECF No. 42-2.

---

[3] Plaintiff argues that Defendant paid Mr. Jubela more while he worked as a receptionist than it paid Plaintiff for her role as an Accessioner, ECF No. 49-4 at 4, but this conclusion is drawn from a misinterpretation of the record. Although Mr. Jubela's performance review may have been conducted in late 2007, his salary increase to $32,000 did not go into effect until February 2008, the same time that Plaintiff's salary increased to $32,000. ECF No. 55 at 2; ECF No. 48-2. Mr. Jubela was thus never paid more as a receptionist than what Plaintiff was paid as an Accessioner.

For the 2008 performance period, Plaintiff and Mr. Jubela earned the same increase from $34,000 to $37,000. ECF No. 41-10; ECF No. 42-3. Dr. Bale, Plaintiff's then-supervisor, noted on her annual review that she was "focused," a "very hard worker, dependable, and a team player." ECF No. 48-2 at 32. At some point around this time, Defendant promoted Plaintiff to Senior Accessioner. ECF No. 48-2 at 25.

On October 17, 2009, Dr. Bale unofficially promoted Plaintiff and Mr. Jubela to co-supervisor positions, increasing their responsibilities and raising their salaries from $37,000 to $40,000. ECF No. 41-12; ECF No. 62-6. For the 2009 performance period, Plaintiff received all Successfully Meets Expectations ratings. ECF No. 62-1. Dr. Bale noted: "Kiesha has done a great job this year, taking on Sr. Accessioners responsibilities with the departure of her supervisor to grad school. She and Ray Jubela have divided the work well between them, and they continue to mentor the two 2 more junior employees in their department." *Id.* at 5. Dr. Bale did not include any notes in the comment box labeled "List below any performance expectations/goals for the next rating period." *Id.*

Mr. Jubela earned two Exceeds Expectations and eleven Successfully Meets Expectations. ECF No. 41-16. Dr. Bale commented: "Ray has really taken on a new set of responsibilities in Accessioning. He is always the one I can depend on to take care of any issue that comes up or fix any mistake. He goes the extra mile in terms of putting in time and staying late as needed." *Id.* at 5. She also wrote: "I would like to see Ray gain more knowledge of basic genetics principles, either through completion of an on-line learning program or taking a class at Montgomery College. I expect Ray to continue upward and take even more management responsibilities in the next 1-2 years." *Id.*

In conjunction with these performance reviews, Plaintiff received a five percent pay increase from $40,000 to $42,000, ECF No. 41-15, and Mr. Jubela received a ten percent increase from $40,000 to $44,000. ECF No. 42-5.

As part of their unofficial supervisory duties, Dr. Bale expected Plaintiff and Mr. Jubela to handle difficult conversations with the Accessioners. *See* ECF No. 48-6 at 32:15–18. In June 2010, during one such conversation that included Plaintiff, Mr. Jubela, Accessioner Michelle Gardner, Accessioner Danielle Balmaceda, and Accessioner Phoebe McDougal, one of the employees complained that Mr. Jubela was not helping with an aspect of the team's work. ECF No. 41-3 at 13:1–4. Mr. Jubela lost his temper, cursing and using degrading language to describe the team. *Id.* He stated that the Accessions Department was made up of "the most ignorant bunch of women [he had] ever met" and that the women were "lazy and stupid." ECF No. 41-20. He called one employee "a baby," accused Phoebe and Michelle of doing "a shitty job" and told the team, "fuck you." *Id.* Mr. Jubela was asked to apologize and attend anger management classes. ECF No. 48-6 at 35:2–7. After this incident, Dr. Bale divided the work between Plaintiff and Mr. Jubela so that Plaintiff was primarily responsible for "personnel" issues while Mr. Jubela was primarily responsible for "workflow." ECF No. 41-3 at 13:14–21.

Despite this incident, Plaintiff and Mr. Jubela received equal three percent raises for the 2010 performance period, meaning Plaintiff continued to earn less than Mr. Jubela. ECF No. 41-18; ECF No. 42-6. Plaintiff's pay increased from $42,000 to $43,260, and Mr. Jubela's increased from $44,000 to $45,320. *Id.*

For the 2010 performance period, Plaintiff received four Successfully Meets Expectations, six Exceeds Expectations, and two Outstanding ratings. ECF No. 48-3. As part of her 2010 year-end review, Dr. Bale commented that Plaintiff had "valiantly stepped up to a

supervisory role" and that she was handling the position in "an outstanding manner." *Id.* at 32.

Dr. Bale also noted that Plaintiff's academic background was an asset. *Id.* at 34. Mr. Jubela's

2010 performance review is not included in the record.

In 2011, Plaintiff started keeping a refrigerator in her office because the Accession

Department was not near the kitchen or break room. ECF No. 48-1 ¶ 8. Mr. Jubela and the

Accessioners would use the fridge to store snacks, and some of Plaintiff's subordinates started to

take their breaks in her office. *Id.*; ECF No. 41-3 at 16:9–15.

On March 14, 2011, Dr. Bale formally promoted both Plaintiff and Mr. Jubela to

Supervisor of the Accessions Lab, effective February 5, 2011. ECF No. 41-22; ECF No. 41-23.

In mid-2011, Dr. Renee Varga, Assistant Director of Core Support Services, began supervising

Plaintiff and Mr. Jubela. ECF No. 41-24 ¶ 5. Communication between Plaintiff and Mr. Jubela

had deteriorated after the June 2010 incident. ECF No. 41-3 at 14:13–16. Further, under Dr.

Varga's supervision, Plaintiff made fewer suggestions because she felt that Mr. Jubela's opinions

were prioritized, and she thought working on implementing "the team's ideas" rather than

pushing her own ideas would best "create a cooperative environment." ECF No. 48-1 ¶ 14. She

would sometimes implement "simple and intuitive" changes to the Accession Department's

processes based on Accessioner feedback without promoting her initiative to Dr. Varga. *Id.*

For the 2011 performance period, Plaintiff received twelve Successfully Meets

Expectations and one Exceeds Expectations. ECF No. 41-25. Dr. Varga praised Plaintiff for

having "the trust and respect of members of her term" and "those outside of her department." *Id.*

at 4. She also noted: "Keisha works hard to get her work done and will stay late or come in on

the weekend to help out other team members." *Id.* at 5. Additionally, Dr. Varga commented:

"while she is good about completing her job responsibilities, I would like to see more initiative

in volunteering for side tasks and brainstorming ideas about where she could best use her abilities to improve things." *Id*. at 5.

Although Dr. Varga was apparently only vaguely aware of the June 2010 incident, ECF No. 41-27 at 14:17–21, she still commented numerous times on Mr. Jubela's evaluation that Mr. Jubela needed to improve his interpersonal and communications skills:

- "Ray has been working on improving his Interpersonal skills, especially concerning relating with others outside of Accessions." ECF No. 41-28 at 4.

- "One area that can be improved upon is how he comes across to others regarding accepting responsibility for mistakes and poor judgement." *Id.*

- "[W]e need to work on improving his communications and the impressions he gives to some of those outside of his department." *Id.* at 5.

- "One of Ray's goals will be to continue to improve his interpersonal skills, how he comes across to others and how to better communicate with others, even in difficult situations." *Id.* at 6.

Despite this feedback, Mr. Jubela earned one Outstanding, three Exceeds Expectations, and nine Successfully Meets Expectations on his 2011 review, including a "Successfully Meets Expectations" for the Communication Skills category and an "Outstanding" in the Teamwork category. ECF No. 41-28. Dr. Varga's positive feedback for Mr. Jubela included that he "had written a great training checklist that was used as template for all other departments," *id.* at 3, and that he was "great about volunteering for tasks and turn[ing] them around quickly," *id.* at 4.

For this performance period, Plaintiff received a 2.14 percent pay increase which increased her salary from $43,260 to $44,190. ECF No. 41-26. She also received a $2,000 bonus. *Id.* Mr. Jubela also received a 2.14 percent pay increase, increasing his salary from $45,320 to $46,294. ECF No. 42-7. Mr. Jubela also received a $2,000 bonus. *Id.*

On November 26, 2012, Plaintiff complained to Dr. Varga on behalf of the team about Mr. Jubela's communications skills. Specifically, Plaintiff complained: "When [R]ay flies off the

handle the accessions [team] feel uncomfortable and then don't want to go to him for anything. His flying off the handle also give a negative impression to the accessioners." ECF No. 41-34. The next day, Mr. Jubela received a "Spot Award Bonus" for volunteering to complete a project. ECF No. 41-33. Dr. Varga did not track complaints about Mr. Jubela's communication style or penalize him, but she did discuss the issue with him and noted the issues in his evaluation. ECF No. 41-24 ¶ 8.

For the 2012 performance period, Plaintiff received two Exceeds Expectations. ECF No. 41-30. Dr. Vargas praised Plaintiff Foster for being "hands-on with her team" and her willingness to help the team out as needed. *Id.* at 3. She commented that "[w]hen someone comes to" Plaintiff "with a question or problem, she will work hard to find the answer," and that the Accessions team had a 99.8% accuracy rate under her supervision, *Id.* at 6. Dr. Varga also provided this feedback:

> Kiesha has always had a welcoming and friendly demeanor which has created an open and enjoyable working environment for her team. This is an important quality for a supervisor so that others feel comfortable to come to her with questions. While I am happy that her team feels so at ease with her, I feel that is also negatively impacting her time management and causing her to miss deadlines like she has this past year.

*Id.* at 6. Dr. Varga gave Plaintiff this feedback because she noticed that employees were spending time in Plaintiff's office and she believed it was affecting Plaintiff's ability to complete projects on time. ECF No. 41-24 ¶ 6. During this performance period, Dr. Varga had begun tracking Plaintiff's deadlines. *Id.* ¶ 7. Throughout the year, Dr. Varga made two notes about times—seven months apart—when she felt Plaintiff had not completed requests in a timely fashion. ECF No. 41-32 at 3. Dr. Varga did not keep similar metrics for Mr. Jubela.

As for Mr. Jubela's 2012 performance review, he received five exceeds expectations. ECF No. 41-31. Dr. Varga commented:

> Ray is an overall good worker who has a good rapport with his team. He works hard, is a team-player and is good at figuring out where a problem is affecting his workflow and then works hard to get it resolved. While there have been some learning experiences in handling conflict situations, he is open to working towards improving in this area and has made progress.

*Id.* at 6. She brought up Mr. Jubela's interpersonal skills and difficulties handling conflict in two other places in the review. *Id.* at 4, 6. She also noted that Mr. Jubela had become "much better about clocking in and out for lunch and for the day." *Id.* at 6.

Plaintiff and Mr. Jubela both received a 4.2 percent pay increase, meaning Plaintiff's salary increased from $44,190 to $46,056, while Mr. Jubela received an increase from $46,320 to $48,245. ECF No. 41-35; ECF No. 42-8. Plaintiff received a $1,725 bonus, and Mr. Jubela received a $2,300 bonus.

In 2013, Plaintiff again complained to Dr. Varga about Mr. Jubela's communication style. ECF No. 41-24 ¶ 10; ECF No. 41-43. Dr. Varga noted that Mr. Jubela had been observed "talking loudly on the phone, especially when upset" or when "complaining about someone," and "using inappropriate language," and "falling asleep" in a meeting. ECF No. 41-45. Dr. Varga wrote talking points for her conversation with Mr. Jubela about the issues in which she noted that some people found Mr. Jubela "difficult to interact" with even though his position demanded that people feel comfortable bringing him problems and ideas. *Id.* In the margins of her talking points, she wrote herself the note "downplay." *Id.*

Towards the end of 2013, Dr. Varga awarded both Plaintiff and Mr. Jubela a Spot Bonus for being "a great help" when Defendant was shorthanded. ECF No. 48-2 at 29; ECF No. 48-3 at 85. Dr. Varga noted that Plaintiff and Mr. Jubela had "stepped up" and "volunteered for extra projects." *Id.* Plaintiff received $225 while Mr. Jubela received $250. *Id.*

For the 2013 performance period, Plaintiff received all Successfully Meets Expectations. ECF No. 41-39. Dr. Varga commented: "Overall Kiesha performs the daily tasks required of her well. However, the additional side tasks take longer or do not get done." *Id.* at 6. Regarding Plaintiff's "Interpersonal Skills," for which Plaintiff was rated as meeting expectations, Dr. Varga wrote: "She has a good relationship with those within and outside of her team. She makes sure that her team doesn't get overly stressed by keeping the atmosphere light and jovial." *Id.* at 4. Dr. Varga did not provide any constructive feedback on how Plaintiff could exceed expectations for this skill. *Id.* at 4.

Mr. Jubela was also rated as meeting expectations for interpersonal skills even though Dr. Varga commented that he had "room for improvement." ECF No. 41-40 at 4. Specifically, she wrote that Mr. Jubela needed to continue to work on "communicating with others in a tactful, respectful and constructive manner." *Id.* Overall, Mr. Jubela received one Outstanding and three Exceeds Expectations. *Id.* Dr. Varga commented:

> Ray is one of the most dedicated employees at GeneDx. He comes in whenever he is needed and is always available by phone. He readily answers questions and promptly fulfills requests. He has been working on his communication skills and should continue to do so. Overall Ray is a great employee with a big heart who works hard to make sure things are done right.

*Id.* at 5. She also wrote:

> Communication is the biggest goal for Ray, especially now that he has direct reports. Communication is not just the words spoken or written, but also body language, listening, effectively, patience, tone of voice ... **A goal for next year is to continue to pay attention to all aspects of communication in all modes** (phone, face-to-face, e-mail, notes, etc.) to make sure they are thorough and appropriate for the situation. His job requires interaction both with his team and others throughout the company so having good communication skills is essential. It is important to make sure that your team doesn't get walked-on, but best to do so in a tactful and constructive way. It is also important to not make assumptions about others' intents, for example, don't assume that someone coming with a problem and proposed solution is close-minded to alternatives that require a change in their own workflow. **Another goal for this year is to improve QC upkeep.** This has

been difficult due to work overload, but a plan to relieve some regular duties
should leave more time to focus on these higher level tasks.

*Id.* at 6 (emphasis in original). Plaintiff received a 3.10 percent pay increase, from $46,056 to
$47,484. ECF No. 41-41. Mr. Jubela received a 10 percent pay increase, from $48,245 to
$53,070. ECF No. 42-11. However, Plaintiff received a larger bonus ($2,000) than Mr. Jubela
who received a $1,500 bonus. ECF No. 41-24 ¶ 13; ECF No. 41-47; ECF No. 42-12. According
to Dr. Varga she gave Plaintiff a larger raise than Mr. Jubela to "slightly" offset the discrepancies
between Plaintiff and Mr. Jubela's raises. ECF No. 41-24 ¶ 13.

In 2014, Plaintiff's subordinates continued to spend time in Plaintiff's office for work and
break related purposes. ECF No. 48-1 ¶ 9. Desilyn Coverley, Jennifer Nyugen, and Mathias
D'Amico visited Plaintiff's office most frequently. *Id.* Ms. Nyugen is pre-diabetic and needs
snacks to maintain her blood sugar level, so she took breaks frequently. *Id.* ¶ 10. Ms. Nyugen
used Plaintiff's office fridge approximately twice daily for that purpose and would sometimes
stop by her office additional times if she had work-related questions for Plaintiff. *Id.* Ms.
Coverley spent time in Plaintiff's office because she relied on Plaintiff for emotional support
related to her work and personal issues, including frustrations with what Plaintiff termed "Mr.
Jubela's volatility." *Id.* at ¶ 11.

Mr. Jubela also had visitors on almost a daily basis for work- and non-work related
reasons. *Id.* at ¶ 13. Also around this time, Dr. Varga continued to work with Mr. Jubela on his
communications issues. ECF No. 48-3 at 93. For example, in February 2014, she used an email
correspondence in which Mr. Jubela appeared annoyed when a colleague followed up on an
earlier request, telling her curtly: "This could easily have waited til Monday as it came in Late
Friday, but I have taken care of it." *Id.* The colleague explained: "Thanks, Ray, didn't mean to
rush you. Someone asked me to check on it today so I didn't want it to fall through the cracks,

we are really busy (I'm sure you are too) so I wanted to check it off my list." *Id.* To which Mr. Jubela responded "Well as payment you now have to feed your children sugar and Red Bull and let them stay up all night!!!! If you don't have children…then give sugar to someone else's kids…that would be even more fun!!!! Just not Renee's children…they are already pretty wound up…" *Id.*

In July 2014, Dr. Varga brought to Plaintiff's attention that she was concerned about how much time Ms. Coverley and others spent in Plaintiff's office chatting and reminded Plaintiff that it is her responsibility to ensure that Ms. Coverley returns to work at the end of her breaks. ECF No. 41-50 at 3. Plaintiff told Dr. Vargas that she had mentioned this issue to Ms. Coverley and that she would do so again. *Id.*

An Accessioner, Ashley Marth, apparently grew frustrated by her team's chattiness and took it upon herself to take notes about the issue. ECF No. 50. Her notes primarily included complaints about Ms. Coverley, but they also mention Plaintiff and others. *Id.* In September 2014, Ms. Marth asked to be transferred from Plaintiff's supervision to Mr. Jubela's supervision, ECF No. 41-52, and sent her log of notes to Dr. Vargas. ECF No. 41-51. Another Accessioner, Briana Driscoll also complained to Dr. Vargas about Ms. Coverley. ECF No. 41-53. Regarding Plaintiff, Ms. Driscoll complained that she did not know Plaintiff's duties and that Plaintiff often deferred to Mr. Jubela. *Id.*

Around October 2014, Dr. Varga decided to hire a manager for the Accession Department. ECF No. 48-3 at 45. Also, in October 2014, Dr. Varga convened an impromptu meeting with Plaintiff to discuss her performance. *Id*; ECF No. 41-3 at 32:16–22. Among other topics of discussion, Dr. Varga raised employee complaints that some Accessioners stayed in Plaintiff's office for extended periods of time to discuss both work and personal issues; Dr.

Varga's concern that Plaintiff took multiple or extensive lunch breaks; complaints that Plaintiff was unfamiliar with protocols; and Dr. Varga's concern that Plaintiff does not volunteer for projects. ECF No. 41-54; ECF No. 41-55. Dr. Varga also mentioned that she intended to hire a manager for the Accessions team and invited Plaintiff to apply for the position. ECF No. 48-3 at 49. Plaintiff felt ambushed by this meeting and was confused by why these perceived performance deficiencies had not been raised in her previous performance evaluations. ECF No. 48-3 at 45, 47.

Plaintiff responded in writing to the issues raised by Dr. Varga. ECF No. 48-3 at 47. She explained that she kept an open-door policy to motivate her team and build rapport. *Id.* at 47. She recommended that Dr. Varga address the entire team if the department culture must change. *Id.* Plaintiff defended her dedication to the team by noting that she worked overtime and provided specific examples of working overtime when Mr. Jubela was on vacation, such as in the beginning of October 2014. *Id.* Plaintiff denied leaving on excessive Starbucks breaks and specifically stated that she left twice in the past six months, once to obtain coffee for the team. *Id.* at 48. She confirmed that she adhered to the 30-minute lunch break and two 15-minute breaks allocated by company policy. *Id.*

Plaintiff denied that she was unfamiliar with protocols and explained that Accessioners generally asked her science-related questions while reserving protocol-related questions for Mr. Jubela because protocol changes were typically (and improperly) communicated directly to Mr. Jubela rather than Plaintiff—an issue that Plaintiff had raised with Dr. Varga in the past. *Id.* Regarding the claim that Plaintiff did not share ideas, Plaintiff provided three specific ideas she introduced in September 2014 alone. *Id.* Plaintiff invited Dr. Varga to observe her daily work so that Dr. Varga could get a firsthand account of how Plaintiff spent her time. *Id.*

After the meeting with Dr. Varga, Plaintiff told her subordinates that they could no longer use her office for breaks. ECF No. 41-3 at 26. Ms. Coverley, however, continued to spend time in Plaintiff's office. ECF No. 41-56 at 2; ECF No. 41-57 at 2.

Also, after their meeting, Dr. Varga directed Mr. Jubela to document and report on Plaintiff's activities. ECF No. 48-6 at 46:14–47:9. On the day after Thanksgiving, November 28, 2014, Mr. Jubela texted Dr. Varga that Plaintiff and Ms. Coverley were still in the office after everyone else had clocked out for an early release. ECF No. 48-3 at 97. Dr. Varga drove to the office to investigate. *Id.* Plaintiff, Ms. Coverley, and another colleague were eating lunch, and explained to Dr. Varga that they were off the clock. *Id.* Just before Plaintiff began her lunch break, her colleague had confided that a mutual friend was murdered on Thanksgiving day. ECF No. 48-1 ¶ 16. Plaintiff was shocked by the conversation and inadvertently forgot to clock out before starting lunch. *Id.* Based on this incident, Dr. Varga accused Plaintiff of "stealing" time. ECF No. 41-24 ¶ 14.

Around this same time, Plaintiff discovered that Mr. Jubela was paid more than she was when she saw his paystub left in the open. ECF No.48-1 ¶ 15. He previously talked about the fact that he received annual raises, but she was unaware that he was being paid thousands of dollars more than she was until late 2014. *Id.*

On December 10, 2014, Plaintiff met with Heather Hackworth, the Director of Human Resources, Dr. Varga and Dr. Olivos-Glander to address the complaints Plaintiff brought up in response to her earlier impromptu meeting with Dr. Varga and Plaintiff's performance. ECF No. 54:3–55:17; ECF No. 41-24 ¶ 15. After that meeting, Dr. Varga sent an email to the entire Accessions Department stating, in relevant part, that employees must "limit non-work related socialization, including no more sitting in offices to snack/chat" and that "[t]he kitchen is

available for breaks." ECF No. 41-61. Dr. Varga wrote, "I don't want this to sound like we want

an 'all work and no play' type of environment. I want everyone to be friendly and happy as long

as it doesn't interfere with getting your work done." *Id.*

For the 2014 performance period, Plaintiff received a Needs Improvements in one area

and Successfully Meets Expectations in the remaining areas. ECF No. 41-62. Dr. Varga

commented:

> At some point she fell behind with chart checking and couldn't catch up by the
> end of the year, however, now that she is caught up I expect her to remain so. This
> past year I had noticed that too much socialization and extensive absences
> occurring and brought them to her attention. In addition there were multiple
> reports of inappropriate conversations. This created a stressful and distrustful
> environment within the team. After discussing the issues at hand and clarifying
> my expectations the situation has gotten much better. I expect this to continue to
> improve. One aspect that I've always admired about Kiesha is how she is able to
> get along with others and interact with people at all levels easily and calmly. This
> is important for her position and is not easily trainable. I am sure she will do well
> as we work to get these other areas back on track.

*Id.* at 3.

Mr. Jubela earned two Outstandings, four Exceeds Expectations, and five Successfully

Meets Expectations. ECF No. 41-64. His review included positive feedback like:

- "As a supervisor, Ray excels at finding and solving issues related to workflow." *Id.* at 3.

- "Ray not only not only works hard to implement changes that others ask him to make, he
  sees places that need improving comes up with solutions and then works to get solutions
  in place that work for everyone." *Id.*

- "Ray is the go-to guy for anything Accessions. He not only has knowledge about the
  processes in Accessions, but he also has lots of knowledge about the processes outside of
  Accessions which helps when he is trying to adjust workflows." *Id.* at 4.

- "Problem solving is one of Ray's strongest areas." *Id.* at 5.

- "Ray's dedication to his team and the company has been proven time and again." *Id.*

Dr. Varga also thought Mr. Jubela had "improved" his interpersonal and communications skills. *Id.*

Before any pay increases went into effect based on the 2014 performance period, both Plaintiff and Mr. Jubela interviewed for the manager position that Dr. Varga had mentioned in the November 2014 meeting with Plaintiff. ECF No. 41-67; ECF No. 41-68. The position required either: (1) a Bachelor of Science in chemistry, biology, or related science filed with 3–4 years of progressive, related experience as an Accessioner; or (2) 2–3 years of college with 5–6 years, related, progressive experience as an Accessioner. ECF No. 41-66. Defendant had several other jobs available when the manager position was posted, but the manager job description was the only one that required only some years of college; the rest of the vacancies all either required a college degree or did not. ECF No.48-2 at 16.

Plaintiff met these requirements because she held a Bachelor of Science and worked as an Accessioner Supervisor for more than 4 years. ECF No. 41-3 at 3:2–4. The resume Mr. Jubela submitted only showed his work experience and did not include any information about his educational background. ECF No. 48-3 at 101. Mr. Jubela did not have a college degree, but he had attended courses at Montgomery College from 1988–1991 part-time, earning "30 to 40 credits" towards a two-year Associates Degree, which required at least 60 credits to complete. ECF No. 41-21 at 3:19–4:5. Dr. Varga did not verify whether either Plaintiff or Mr. Jubela met the manger position's education and experience requirements because they were both "internal candidates" who had been working under her supervision.

Dr. Varga asked different interview questions for the two candidates. ECF No. 48-5 at 26. Dr. Varga questioned Mr. Jubela "mostly" about his "plans for the future" should he get the position, ECF No. 48-6 at 50:1–3, while questioning Plaintiff about her ability to dedicate

sufficient time to the company, ECF No. 48-5 at 29:10–19. In her notes about why Plaintiff was not selected, Dr. Varga wrote that Plaintiff had interviewed well but that Plaintiff was not ready for a promotion because of "some learning experiences" from the past year. ECF No. 41-67 at 3.

After not receiving the promotion, Plaintiff received a 3.72 percent pay increase, from $47,484 to $49,265 and an $800.00 bonus. ECF No. 41-62. Mr. Jubela received a $3,000 bonus, was promoted, and received a substantial pay increase to $70,000. ECF No. 48-3 at 95.

Overall, throughout Plaintiff's tenure, Plaintiff and Mr. Jubela's pay compared as summarized below:

| Date | Plaintiff | Jubela | Citations |
|------|-----------|--------|-----------|
| 2007 | $28,080 | $28,000 | ECF No. 62-1; ECF No. 42-1. |
| February 2008 | $32,000 | $32,000 | ECF No. 53-1; ECF No. 55. |
| September 2, 2008 | $34,000 | $34,000 | ECF No. 62-3; ECF No. 62-8. |
| February 6, 2009 | $37,000 | $37,000 | ECF No. 41-10; ECF No. 42-3. |
| October 21, 2009 | $40,000 | $40,000 | ECF No. 41-12; ECF No. 62-6. |
| February 2010 | $42,000 (5% increase) | $44,009 (10% increase) | ECF No. 41-15; ECF No. 42-5. |
| February 2011 | $43,260 (3% increase) | $45,3201 (3% increase) | ECF No. 41-18; ECF No. 42-6. |
| February 2012 | $44,190 (2.14% increase) | $46,294 (2.14% increase) | ECF No. 41-25; ECF No. 42-7. |
| February 2013 | $46,056 (4.2% increase) | $48,245 (4.2% increase) | ECF No. 41-25; ECF No. 42-8. |
| February 2014 | $47,484 (3.1% increase) | $53,070 (10% increase) | ECF No. 41-41; ECF No. 41-11. |
| February 2015 | $49,265 (3.72% increase) | $70,000 (Mr. Jubela received a promotion) | ECF No. 41-63; ECF No. 48-3 at 95. |

Plaintiff resigned on March 16, 2015.[4] On April 13, 2015, Plaintiff filed a complaint with

the Maryland Office of Human Rights alleging that Defendant discriminated against her by

paying her less than Mr. Jubela and failing to promote her. ECF No. 9-2. Plaintiff then timely

filed this suit. ECF No. 1.

In 2016, Dr. Varga continued to receive complaints about how Mr. Jubela's tone and

body language made employees feel uncomfortable and intimidated. ECF No. 48-5 at 16:19–

18:20. In October 2017, Mr. Jubela moved out of his role as manager of the Accessions

Department. ECF No. 48-6 at 18:15–17. He was given a project management role and took a

$5,000 pay cut. *Id.* at 19:8–10.

## II.    STANDARD OF REVIEW

Summary judgment is proper if there are no issues of material fact and the moving party

is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986); *Francis v. Booz, Allen & Hamilton, Inc.,* 452 F.3d 299, 302 (4th

Cir. 2006). A material fact is one that "might affect the outcome of the suit under the governing

law." *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183 (4th Cir.2001) (quoting *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986)). A dispute of material fact is only "genuine" if

sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict

for that party. *Anderson,* 477 U.S. at 248–49. However, the nonmoving party "cannot create a

genuine issue of material fact through mere speculation or the building of one inference upon

another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). The Court may rely on only facts

supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative

---

[4] The parties do not provide accurate record citations for this fact, but it is undisputed. ECF No. 42 at 23 (Defendant describing the date Plaintiff resigned as "March 16, 2016"; ECF No. 49-4 at 21 (same).

obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson,* 477 U.S. at 255.

## III.   DISCUSSION

### A.  Motion to Strike

Because it raises a preliminary issue regarding what evidence the Court will consider in resolving Defendant's Motion for Summary Judgment, the Court must first address Defendant's Motion to Strike. ECF No. 52. Defendant moved for summary judgment on September 28, 2018. ECF No. 41. Plaintiff filed an opposition, ECF No. 48, which she supported with a declaration, ECF No. 48-1. Defendant requests that the Court strike four sentences from paragraph 11 of this declaration, which state:

> Ms. Coverly complained about Mr. Jubela's volatility. She told me that she felt as though she was walking on eggshells around him. Ms. Coverly reported that Mr. Jubela would come in on Saturdays and just watch her and the staff members work without helping, which made her feel uneasy and frustrated. I attempted to reassure her and resolved the communications issues as I was concerned Ms. Coverly would not complete her assignments or quit without intervention.

ECF No. 48-1 ¶ 11. At issue is whether Plaintiff should be allowed to use this information when she did not disclose Ms. Coverley as a person with information about her claims or describe these details in her interrogatory responses.

Under Rule 37(c)(1), "[i]f a party fails to provide information as required by Rule 26(e), the party is not allowed to use that information . . . to supply evidence on a motion . . ., unless the failure . . . is harmless." Fed. R. Civ. P. 37(c)(1). Courts determine whether nondisclosure of evidence is harmless by considering "(1) the surprise to the party against whom [the evidence is raised]; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the

testimony would disrupt the trial; (4) the explanation for the party's failure to [disclose previously]; and (5) the importance of the testimony.'" *Southern States Rack and Fixture v. Sherwin–Williams Co.,* 318 F.3d 592, 596 (4th Cir.2003)). In light of these factors, Plaintiff has demonstrated that her failure to previously disclose that Ms. Coverley had expressed frustrations to her about Mr. Jubela's communications style is harmless.

First, Plaintiff's reliance on facts suggesting Mr. Jubela struggled with his interpersonal skills cannot come as a surprise to Defendant. Plaintiff disclosed in her interrogatory responses several times that she had heard complaints about unprofessional behavior by Mr. Jubela. ECF No. 52-3 at 3, 4, 5. Further, although Plaintiff did not disclose Ms. Coverley as a person with information about her claims, Defendant knew that Ms. Coverley may have relevant information; in fact, Dr. Varga mentioned at her deposition that Ms. Coverley had complained about Mr. Jubela. ECF No. 48-5 at 10:3–7. Additionally, Defendant had an opportunity to cure any surprise by refuting the facts in the disputed four sentences of paragraph 11 in its reply brief. Allowing these four sentences of Plaintiff's declaration to be introduced has no disruptive effect and the evidence is relevant. Finally, the Court is satisfied by Plaintiff's explanation that to the extent she failed to disclose the details described in paragraph 11 of her declaration, those facts flow naturally from the complaint and prior discovery. Taken together, the factors weigh in favor of allowing the declaration.

In any case, at the summary judgment stage, the court views disputed facts in the light most favorable to the non-moving party. Here, the details in paragraph 11 are not the sole record evidence supporting the conclusion that Mr. Jubela struggled with interpersonal skills, which were critical to his role. Specifically, Plaintiff's interrogatory responses, various depositions, and Mr. Jubela's performance reviews all support Plaintiff's contention that Mr. Jubela's

communication skills were lacking. Thus, even without taking paragraph 11 into consideration, the Court would still analyze Defendant's Motion for Summary Judgment with the understanding that Mr. Jubela struggled in this area, meaning Plaintiff's failure to disclose details about Ms. Coverley's frustrations was harmless.

In sum, the disputed sentences in Plaintiff's declaration do not cause Defendant any prejudice, and Defendant's Motion to Strike will be denied.

### B.  Motion for Summary Judgment

Defendant seeks summary judgment on Plaintiff's federal and Maryland law wage discrimination and failure-to-promote claims. Although some of Plaintiff's wage discrimination claims are time barred, entitling Defendant to partial summary judgment, genuine disputes of material fact otherwise preclude summary judgment on Plaintiff's remaining wage discrimination and failure-to-promote claims.

### i.  Wage Discrimination

Claims brought pursuant to 42 U.S.C. § 1981 are subject to a four-year statute of limitations. *See Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 666 (4th Cir. 2015) (applying 28 U.S.C. § 1658's "catchall" statute of limitations to § 1981); 28 U.S.C. § 1658(a) ("a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues."). The statute of limitations set by § 1658(a) begins to run "after the cause of action accrues," not "after the discovery of the facts constituting the violation." *Compare* 28 U.S.C. § 1658(a) *with* 28 U.S.C. § 1658(b)(1). Because Plaintiff filed her Complaint on October 31, 2016, Plaintiff's §

1981 race discrimination claim runs from October 31, 2012 through March 16, 2015, the date she resigned.[5]

A two-year statute of limitations is applicable to claims brought pursuant to Maryland's FEPA. Md. State Gov't Code Ann, § 20-607(b) (liability may accrue "for up to 2 years preceding the filing of the [charge]."). Since Plaintiff filed her charge of discrimination on April 13, 2015, Plaintiff's race and gender discrimination claims under this statute runs from April 13, 2013 through March 16, 2015. Thus, Plaintiff must establish that "an unlawful employment practice" with respect to her compensation occurred during this period. *Id.* An unlawful employment practice occurs when:

> (1) a discriminatory compensation decision or other practice is adopted;
> (2) an individual becomes subject to a discriminatory compensation decision or other practice; or
> (3) an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting wholly or partly from the discriminatory compensation decision or other practice.

*Id.* Thus, to the extent that Plaintiff was affected after April 13, 2013 by the application of a discriminatory compensation decision that occurred before April 13, 2013, she may recover for the effect of that decision to the extent it was felt after April 13, 2013.

Applying these statutes of limitations, Plaintiff's claim that she was discriminated against in 2008 when Mr. Jubela's starting salary as an Accessioner was about $4,000 more than Plaintiff's starting salary had been in 2007 even though he had less relevant education is time barred. Otherwise, Plaintiff and Mr. Jubela's pay discrepancies began in February 2010 when

---

[5] Plaintiff cites the superseded *Hamilton v. First Source Bank*, 895 F.2d 159, 163–164 (4th Cir. 1990) to support her argument that the "discovery rule," which allows a claim to accrue when the litigant first learns of the facts that form the basis for an action, should apply to her earlier wage discrimination claims. That case was reversed by the Fourth Circuit en banc, *Hamilton v. 1st Source Bank*, 928 F.2d 86, 87 (4th Cir. 1990), which found the discovery rule inapplicable to a wage discrimination claim brought pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34.

Mr. Jubela started earning about $2,000 more than Plaintiff annually. ECF No. 41-15; ECF No. 42-5. To the extent that this discrepancy was the result of wage discrimination, claims accruing before October 31, 2012 are time barred. Plaintiff may recover for discriminatory compensation decisions made after October 31, 2012 on the basis of her race pursuant to § 1981. Additionally, to the extent that a discriminatory compensation decision was made before April 2013 (i.e., in February 2010 or otherwise) but was applied during Plaintiff's FEPA claim period, Plaintiff may recover for the harm caused during the claim period but not for discrepancies in paychecks she received outside of the statute of limitations.

The *McDonnell Douglas* framework applies to discrimination cases arising under § 1981 and Maryland law. *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 216–17 (4th Cir. 2016) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)) (explaining that *McDonnell Douglas* was initially developed for Title VII discrimination cases "but has since been held to apply in discrimination cases arising under § 1981"); *Belfiore v. Merch. Link, LLC*, 236 Md. App. 32, 45, n. 3 (2018) (applying the *McDonnell Douglas* framework and noting "Maryland courts interpreting state and county laws prohibiting discrimination have generally found federal decisions construing comparable federal laws persuasive, if not absolutely determinative.").

The *McDonnell Douglas* framework includes three steps: (1) the plaintiff must first establish a prima facie case of wage discrimination; (2) the burden then shifts to the employer to articulate a non-discriminatory reason for the pay discrepancy; (3) the burden then shifts back to the plaintiff to prove that the stated reason for the pay discrepancy is a pretext and that the true reason is discriminatory. *Guessous*, 828 F.3d at 216.

To establish a prima facie case of wage discrimination based on race or sex, "a plaintiff must prove that (1) she is a member of a protected class; (2) she was paid less than an employee outside the class; and (3) the higher paid employee was performing a substantially similar job." *Kess v. Mun. Employees Credit Union of Baltimore, Inc.*, 319 F. Supp. 2d 637, 644 (D. Md. 2004). It is undisputed that Plaintiff Kiesha Foster, an African-American female, was compensated less than Raymond Jubela, a white male, as they served as co-supervisors overseeing the Accessions Department. ECF No. 62-1; ECF No. 42-1; ECF No. 41-15; ECF No. 42-5.

Because Plaintiff has established her *prima facie* wage discrimination case, the burden shifts to Defendant to offer a legitimate, non-discriminatory reason for the disparity in pay. *Guessous*, 828 F.3d at 216. Defendant has done so, explaining that it paid Mr. Jubela more than Plaintiff based on his superior performance. ECF No. 41-24 ¶ 17.

Thus, the burden shifts back to Plaintiff to show that genuine disputes of material fact remain over whether Defendant's non-discriminatory reason for paying Mr. Jubela more is pretextual. "[T]o show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Haynes v. Waste Connections, Inc.*, ---F.3d---, No. 17-2431, 2019 WL 1768918, at *4 (4th Cir. Apr. 23, 2019). If the plaintiff "offers such circumstantial evidence, the case must be decided by a trier of fact," *id.*, because "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

Here, ample evidence exists from which a factfinder could conclude that Defendant's asserted justification for paying Mr. Jubela more than Plaintiff is false. In February 2010 when Mr. Jubela began to earn more than Plaintiff, both had received satisfactory reviews. Although Mr. Jubela received two more "Exceeds Expectations" ratings than Plaintiff, Mr. Jubela's performance review also included this feedback from Dr. Bale: "I would like to see Ray gain more knowledge of basic genetics principles, either through completion of an on-line learning program or taking a class at Montgomery College . . ." ECF No. 41-16. In contrast, Plaintiff's performance review did not include any negative feedback or constructive criticism. ECF No. 62-1. And the record shows that Plaintiff had the "knowledge of basic genetics principles" that Dr. Bale hoped Mr. Jubela would gain. ECF No. 41-2 at 3:2–4 (discussing Plaintiff's Bachelor of Science); ECF No. 48-1 ¶ 5. Viewing the facts in the light most favorable to Plaintiff, the record does not categorically show that Mr. Jubela was a higher performer than Plaintiff at this time and thus deserved to make more money. Although, Plaintiff cannot recover for the compensation discrepancies that occurred between February 2010 and October 31, 2012, the February 2010 pay decision is still relevant to Plaintiff's claims to the extent that it was applied each time Plaintiff received a paycheck during the claim period. In other words, even if Defendant later was justified in paying Mr. Jubela more than Plaintiff, it is not clear from the record that later performance differences made up for any portion of the pay discrepancy grounded in potential discrimination.

From February 2010 moving forward, Mr. Jubela always made more than Plaintiff even as their percentage raise increases were sometimes the same. For example, Mr. Jubela received an equal percentage—higher value—raise than Plaintiff in 2011 for the 2010 performance period despite the record evidence that he had serious performance issues while Plaintiff performed

adequately for less pay. Specifically, at a June 2010 meeting, Mr. Jubela lost his temper, cursing and using degrading language to describe the team. ECF No. 41-3 at 13:1–4. He stated that the Accessions Department was made up of "the most ignorant bunch of women [he had] ever met" and that the women were "lazy and stupid." ECF No. 41-20. He called one employee "a baby," accused his team of doing "a shitty job" and told the team, "fuck you." *Id.* He was asked to apologize and attend anger management classes, but his pay was apparently not impacted. ECF No. 48-6 at 35:2–7. Mr. Jubela's 2010 performance review is not included in the record.

Defendant's argument that no wage discrimination occurred in 2011 because Plaintiff and Mr. Jubela received the same percentage wage increase fails. First, though Plaintiff and Mr. Jubela both received a 3 percent pay increase, because Mr. Jubela had a higher base salary than Plaintiff, he received a higher value raise. ECF No. 41-18; ECF No. 42-6. Further, the fact that Plaintiff and Mr. Jubela received the same percentage increase, but Mr. Jubela continued to make more than Plaintiff for the same work could also support Plaintiff's claim by showing that they were performing equally well yet Mr. Jubela earned a higher wage. Dr. Bale also formally promoted both Plaintiff and Mr. Jubela in March 2011 while Mr. Jubela was receiving a higher salary, a fact that is inconsistent with Defendant's theory that it continued to pay Mr. Jubela more in 2011 based on his higher performance. ECF No. 41-22; ECF No. 41-23.

Defendant's position that no wage discrimination occurred in 2012 or 2013 because Plaintiff and Mr. Jubela received the same percentage page increase is similarly flawed. ECF No. 41-25; ECF No. 42-7; ECF No. 41-25; ECF No. 42-8. Specifically, the argument fails to account for the fact that Mr. Jubela received a higher value raise and continued to be paid more than Plaintiff although they were apparently each performing well. *Id.* Further, the record indicates that Mr. Jubela's higher value raise may not have been warranted based on his performance. For

example, on Mr. Jubela's 2012 review of the 2011 performance period, Dr. Varga (who had taken over supervision) commented numerous times that Mr. Jubela needed to improve his interpersonal and communication skills. ECF No. 41-28 at 5 ("[W]e need to work on improving his communications and the impressions he gives to some of those outside of his department"); *id.* at 6 ("One of Ray's goals will be to continue to improve his interpersonal skills, how he comes across to others and how to better communicate with others, even in difficult situations."). The same issue came up on Mr. Jubela's 2013 review of the 2012 performance period. ECF No. 41-31 at 4, 6. These persistent issues with Mr. Jubela's performance arose even though Dr. Varga was only vaguely aware of the 2010 incident in which Mr. Jubela had cursed at his team. ECF No. 41-27 at 14:17–21. Although Plaintiff's performance evaluations also included comments on areas that she could improve, these comments only serve to create disputed facts about how Plaintiff and Mr. Jubela's performances compared.

Disputed facts also exist over whether Mr. Jubela was outperforming Plaintiff when he received a 10 percent raise compared to her 3.1 percent raise in February 2014 for the 2013 performance period—the last time before Mr. Jubela's promotion when Plaintiff and Mr. Jubela's salaries diverged though they had the same job. ECF No. 41-41; ECF No. 41-11. First, the record shows that Plaintiff actually received a larger bonus ($2,000) than Mr. Jubela who received a $1,500 bonus. ECF No. 41-24 ¶ 13; ECF No. 41-47; ECF No. 42-12. Bonuses are typically given to reward performance, meaning the choice to give Plaintiff a larger bonus than Mr. Jubela is inconsistent with Defendant's articulated explanation that it paid Mr. Jubela more overall because of his superior performance.

Further, both Plaintiff and Mr. Jubela's performance evaluations contain praise and constructive feedback. ECF No. 41-39; ECF No. 41-40. And Mr. Jubela's communication issues

persisted. ECF No. 41-24 ¶ 10; ECF No. 41-45. Yet the record includes evidence suggesting that Dr. Varga may have arbitrarily favored Mr. Jubela. For example, towards the end of 2013, Dr. Varga awarded both Plaintiff and Mr. Jubela a Spot Bonus for the same reason—stepping up to volunteer for the same extra project—but Plaintiff's bonus was $225 compared to Mr. Jubela's $250. ECF No. 48-2 at 29; ECF No. 48-3 at 85. Similarly, Dr. Varga appeared to "downplay" Mr. Jubela's performance issues, writing herself a note to do so in a meeting with Mr. Jubela about his workplace conduct, ECF No. 41-45, and declining to mention that that he had fallen asleep in a meeting or that he continued to use inappropriate language, *id.*, on his review, ECF No. 41-40.

Defendant focus much of its motion on facts that show Plaintiff was not always a model employee. On this point, the Fourth Circuit's recent decision in *Haynes v. Waste Corrections, Inc.* is instructive. There, the court found disputes of material fact existed over how satisfactorily an African-American plaintiff performed next to a white comparator where both employees had made mistakes on the job. Although, among other infractions, the white employee had become angry and yelled at his supervisor before quitting his job, he was permitted to return to the job. 2019 WL 1768918 at *3. In contrast, the African-American plaintiff who also had workplace infractions but "did not yell at his supervisor" was terminated. *Id.* The court noted that based on the evidence, the white employee "may have engaged in more egregious conduct" and "yet received more favorable treatment." *Id.* The Fourth Circuit rejected the defendant-employer's argument that the plaintiff and white employee's conduct could not be properly compared because the plaintiff's infractions caused more harm to the employer, finding that this conclusion was a matter of dispute. Specifically, the court noted that despite the employer's conclusion to the contrary, the record indicated the plaintiff's conduct had not caused damage. While

acknowledging that the plaintiff in *Haynes* was not "a perfect or model employee," the Fourth Circuit nonetheless found that disputes of material fact precluded summary judgment on his employment discrimination claims.

Just as in *Haynes*, Mr. Jubela's communications issues may have constituted "more egregious conduct" than Plaintiff's performance issues, yet he "received more favorable treatment." *Id.* Although Defendant claims that Plaintiff's decision to allow employees to spend time in her office caused her to miss deadlines, the record during the period relevant to Plaintiff's wage discrimination claims only includes two examples—seven months apart—when Dr. Varga felt that Plaintiff had not completed requests in a timely fashion. ECF No. 41-32. Dr. Varga did not keep similar metrics for Mr. Jubela, and Defendant did not appear to consider how his performance problems may have impacted the team's productivity. Thus, like in *Haynes*, it is a matter of dispute whether Plaintiff's conduct caused Defendant more harm than Mr. Jubela's conduct.

In sum, genuine disputes of fact remain about whether Defendant paid Plaintiff less than Mr. Jubela between October 31, 2012 and March 16, 2015 because of her race or between April 13, 2013 and March 16, 2015 because of her race and gender. Defendant is thus not entitled to summary judgment on Plaintiff's wage discrimination claims except that Defendant is entitled to summary judgment on Plaintiff's time barred claims.

### ii. Failure to Promote

The *McDonnell Douglas* framework discussed above also applies to Plaintiff's failure-to-promote claim. *Page v. Bolger*, 645 F.2d 227, 228 (4th Cir. 1981). To establish a *prima facie* case of a discriminatory denial of a promotion, an employee must show: (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the

position; (4) she was rejected; and (5) the position remained open or was filled by a similarly qualified applicant outside plaintiff's protected classes. *Id.* at 229–30. Defendant concedes that Plaintiff has established these elements, ECF No. 42 at 31, but claims that the same non-discriminatory performance-based justification for Plaintiff's lower pay legitimately explains the decision not to promote Plaintiff.

"A plaintiff alleging a failure to promote can prove pretext by showing that [she] was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006). Preselection of a candidate, particularly when it contravenes an employer's "own procedures requiring fair consideration of qualified applicants, is 'undeniably relevant to the question of discriminatory intent.'" *Kolstad v. Am. Dental Ass'n.*, 108 F.3d 1431, 1436 (D.C. Cir. 1997) (vacated in part on other grounds); *Crochrell v. Dept. of Transp.*, No. 03–cv–870, 2005 WL 2388267, at \*6 (S.D. Ill. Sept. 28, 2005) (summary judgment denied where evidence existed that an employer preselected a candidate). Additionally, a plaintiff may raise an inference of pretext by showing that an employer deviated from the criteria detailed in its job announcement to hire a particular candidate. *See e.g., Carberry v. Monarch Marking Sys., Inc.*, 30 Fed. Appx. 389, 393 (6th Cir. 2002) (affirming a district court's finding that evidence of an employee deviating from a job description's objective criteria raised an inference of pretext where plaintiff did not simply present "subjective belief that he was better qualified" than a comparator but relied on the defendant's "own printed list of qualifications" to so show).

Plaintiff has introduced sufficient evidence to at least create disputes of material fact over whether Defendant's articulated reason for denying her a promotion was pretextual. First, Plaintiff has introduced evidence that she was "better qualified" for the position based on her

educational background. The position required either: (1) a Bachelor of Science in chemistry, biology, or related science filed with 3–4 years of progressive, related experience as an Accessioner; or (2) 2–3 years of college with 5–6 years, related, progressive experience as an Accessioner. ECF No. 41-66. Plaintiff met these requirements because she held a Bachelor of Science and worked as a Supervisor for more than 4 years. ECF No. 41-3 at 3:2–4. In contrast, viewing the record in the light most favorable to the Plaintiff, Mr. Jubela was not qualified for the position based on these requirements. Mr. Jubela did not provide Defendant with a resume that included his educational background; he did not have a college degree and had only attended courses at Montgomery College from 1988-1991 part-time where he earned "30 to 40 credits" towards a two-year Associates Degree, which required at least 60 credits to complete. ECF No. 41-18; ECF No. 42-6; ECF No. 48-3 at 101.

Additionally, the record includes overwhelming evidence that Mr. Jubela struggled with communications and interpersonal skills—skills that are critical to a manager role. ECF No. 41-3 at 14:13–16; ECF No. 41-28 at 4, 5, 6; ECF No. 41-34; ECF No. 41-40 at 4, 6; ECF No. 41-31 at 6; ECF No. 41-45. To be sure, the record also shows that Plaintiff was struggling with a communications issue of her own in the lead up to when Defendant denied her a promotion. Specifically, Dr. Varga had expressed frustration with Plaintiff that she was not communicating to employees, and that they needed to be working rather than socializing in Plaintiff's office. ECF No. 41-24 ¶ 15. But a dispute of material fact exists over whether Mr. Jubela's problems were downplayed while Plaintiff's issues were emphasized. For example, when Mr. Jubela forgot to clock out for lunch or for the day, Dr. Varga reminded him to do so, later commenting in a performance review that he had become "much better about clocking in and out for lunch

and for the day." ECF No. 41-31 at 6. In contrast, when Plaintiff made the same mistake, Dr. Varga accused Plaintiff of stealing company time. ECF No. 41-24 ¶ 14.

The record also indicates that the manager job description had been specifically tailored to favor Mr. Jubela—while Defendant had several other jobs available when the manager position was posted, the manager job description was the only one that required only some years of college; the rest of the vacancies all either required a college degree or did not. ECF No.48-2 at 16. This evidence raises an inference of pretext because an "employer's preselection of a job candidate, in violation of its own procedures requiring fair consideration of qualified applicants, is 'undeniably relevant to the question of discriminatory intent.'" *Kolstad*, 108 F.3d at 1436. Here, Defendant contravened its own policy by allowing an applicant with only some college experience to apply for a manager position.

Even though the job description appears to have been tailored for Mr. Jubela to apply, Defendant still deviated from the criteria described in the job description when it promoted Mr. Jubela over Plaintiff because, drawing all reasonable inferences in Plaintiff's favor, Mr. Jubela had not met the "at least two years of college" requirement. Thus, based on "Defendant's own printed list of qualifications," Plaintiff "was better qualified." *Carberry*, 30 F. App'x at 393.

Further, before Mr. Jubela was officially hired for the manager role, but after Dr. Varga knew she would be hiring for the position, Dr. Varga asked Mr. Jubela to document and report on Plaintiff's activities. ECF No. 48-6 at 46:14–47:9; ECF No. 41-57. Dr. Varga confronted Plaintiff about employees socializing in her office in October 2014 but told her at the same meeting that she intended to hire a manager for the Accessions team and invited Plaintiff to apply for the position. ECF No. 48-3 at 49. However, shortly after the meeting, Dr. Varga directed Mr. Jubela to report on Plaintiff's work, and Mr. Jubela began sending Dr. Varga emails

detailing Plaintiff's schedule. ECF No. 41-57. This evidence raises an inference of pretext for two reasons. First, it again suggests that Defendant had preselected Mr. Jubela for the role since Dr. Varga appeared to elevate Mr. Jubela over Plaintiff, his co-supervisor, by requesting that he report on Plaintiff's work. *See Crochrell*, No. 03–cv–870, 2005 WL 2388267 at \*6. In *Cochrell,* a district court denied summary judgment where, *inter alia*, a defendant began training an individual for a position before a vacancy announcement was even issued. *Id.* Similarly, here Defendant began elevating Mr. Jubela into the manager role before the job was even posted. Second, it is probative of discriminatory intent because Dr. Varga gave Mr. Jubela the opportunity to build a record against Plaintiff, his sole competition for the manager position. Dr. Varga took this questionable approach even though Plaintiff had invited Dr. Varga to shadow the Accessions team for a day so that Dr. Varga could get a firsthand account of how Plaintiff spent her time. ECF No. 41-54 at 5. Further, if Dr. Varga was concerned with addressing the underlining issue (i.e. that Ms. Coverley was spending too much time not working in Plaintiff's office), it is unclear why she would ask Mr. Jubela to report on Plaintiff and Ms. Coverley's behavior rather than ask him, as the co-supervisor of the team, to suggest that Ms. Coverley focus on work.

In sum, genuine disputed facts remain about why Defendant denied Plaintiff a promotion, and Defendant is not entitled to summary judgment on Plaintiff's failure-to-promote claim.

**IV.     CONCLUSION**

For the foregoing reasons, Motion to strike is denied, and although Defendant is entitled to summary judgment on Plaintiff's time barred wage discrimination claims, Defendant is otherwise not entitled to summary judgment. A separate Order shall issue.

Date: <u>September 30, 2019</u>                              <u>  /s/                                                  </u>
                                                            GEORGE J. HAZEL
                                                            United States District Judge